**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
CECILIA ST. PIERRE, <u>et</u>. <u>al</u>.,          )
                                          )
         **Plaintiffs,**                  )
                                          )
v.                                        )  **No. 1:03 CV 1057 (GK)**
                                          )
GALE A. NORTON, <u>et</u> <u>al</u>.,             )
                                          )  **Judge Gladys Kessler**
                                          )
         **Defendants.**                  )
_____)

**<u>PLAINTIFFS' OPPOSITION TO</u>**
**<u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>**
**<u>(SECOND AMENDED COMPLAINT)</u>**

        This Opposition will show how the instant defense of the Department's arbitrary and

capricious approval of the Third Adoption Ordinance:  (a) is inconsistent with the analyses of

these matters by the BIA staff attorneys and the Department's own Solicitor who recognized

that the adoption ordinances are illegal and the proper subject of Department action,  (b) is

inconsistent with the positions recently taken by the Department in the <u>Seminole</u> <u>Nation</u>

cases regarding similar tribal membership issues, (c) is inconsistent with the recent decisions

of Judges Walton and Kollar-Kotelly which reaffirmed the Department's continuing statutory

and trust responsibilities to prevent unconstitutional changes to the membership criteria of an

Indian tribe, (d) depends upon ignoring the essential <u>facts</u> and misstating Plaintiffs' positions,

and  (e) takes a relatively simple matter and obscures it by digression into procedural

technicalities which upon even cursory examination lack legal merit.

        There is no federal disengagement in core tribal membership matters as the

Memorandum erroneously paints the current legal landscape.  The Shakopee Mdewakanton

(Dakota) Sioux Community (the "SMSC," "tribe" and "Community") has an IRA Constitution which expressly provides for Department oversight of all attempts to change the tribe's core blood quantum requirement.  Department review of attempts to alter core membership criteria remains an essential Department statutory and trust responsibility, a responsibility which the Department vigorously reaffirmed in the <u>Seminole Nation</u> cases just two years ago in this judicial district.  The attached affidavits and letter from the Plaintiffs explain why these adoption ordinances undermine the historical character of the tribe and the integrity of their tribal government (Exhibits 1, 2 and 3).

The Department's approval of any such change in membership criteria, as an agency decision, must accord with the legal standards of the Administrative Procedure Act ("APA").  In 1996, Plaintiffs brought their APA case challenging the Department's approval of the Second Adoption Ordinance which had caused their tribe to be swamped by unqualified individuals without a vote of the membership.  In that matter, Judge Robertson correctly rejected the very same defenses and arguments about indispensable parties, sovereign immunity and jurisdiction that the Department re-hashes in its instant Memorandum.  <u>Feezor v. Babbitt</u>, 953 F. Supp. 1 (D.D.C. 1996).  These arguments should be similarly rejected here by this Court.

Judge Robertson found the real issue to be a dispute about the Department's responsibility to prevent the illegal takeover of an Indian tribe for purposes of controlling its gaming resources – revenues which are now over $650 million per year.  He remanded the case to the Department for consideration of three issues relating to the illegality of the Second Adoption Ordinance that diverted revenues to non-members and in some cases to non-Indians and allowed non-members to vote on tribal matters in degradation of the core

principle of tribal self-determination.  The current tribal leadership recognized that the

Second Adoption Ordinance was going to be declared invalid by the Department in response

to Judge Robinson's remand Order and enacted the identical Third Adoption Ordinance as a

procedural trick to end-run that invalidation.  The Department correctly invalidated the

Second Adoption Ordinance, but the political appointees at the Department approved the

identical Third Adoption Ordinance and ignored critical parts of the remand Order against

the legal advice of the BIA attorneys and the Department's highest legal officer.  These

actions followed a sizable campaign contribution by the tribal officials.  The Department's

decision to go against the legal advice of its Solicitor and staff attorneys undercut Plaintiffs'

victory in <u>Feezor</u>, now forcing Plaintiffs to return to federal court to get a determination

about the legality of the identical Third Adoption Ordinance, something which should have

been done in the context of the <u>Feezor</u> remand.  The pages that follow explain why Judge

Robertson was correct in supporting the rights of the qualified members of the tribe to

control the distribution of gaming revenues and raising questions about the approval of an

ordinance that openly circumvents the tribe's governing charter on membership.  This

Opposition explains why the Department was obligated under the APA and its statutory and

trust responsibilities to disapprove the illegal Third Adoption Ordinance as it suffered from

all the same defects as the Second Adoption Ordinance which the Department properly

invalidated.

# FACTUAL BACKGROUND[1]

A.   The Shakopee Mdewakanton Sioux Community Was Founded As A Blood Quantum Community To Preserve The Unique Cultural Heritage Of The Minnesota Mdewakanton (Dakota) Sioux

The Mdewakanton Dakotas were the people that relinquished by treaty the land that is now the cities of St. Paul and Minneapolis.  Then, in the 1860's the Union Army, preoccupied with the Civil War, stopped honoring the terms of the treaty with the Dakotas.  The Dakotas, mostly Mdewakantons, revolted and at the end of the uprising 38 Dakotas were put to death in a mass hanging.  The State of Minnesota then ordered the removal of the Dakotas from their homeland to camps outside the State.  However, about 100 to 200 Dakotas from Lower Sioux, known as the "Friendlies," were allowed to stay on lands purchased on their behalf.  The Mdewakanton Dakotas are those who were either allowed to stay in Minnesota as the Friendlies or who were part of the Dakota families that migrated back to Minnesota after the Civil War.

In 1969 a small group of Dakota people who resided on the Prior Lake portion of the Lower Sioux reservation lands organized to discuss with the BIA the formation of a new community on lands where federal funding had become available for water, sewer and housing for qualified applicants.  This original group grew to 13 charter members who discussed and defined the membership of the community. The community name became Shakopee Mdewakanton (Dakota) Sioux Community.

---

[1] The facts are as alleged in the pleadings and these must be taken as true for purposes of the Government's Motion.  Plaintiffs have decided to submit supporting affidavits and documents for two reasons.  First, the Government's Motion inserts and relies upon facts, materials and evidence outside the pleadings and the Court might construe the Motion as one for summary judgment.  Second, we want the Court to know that Plaintiffs' allegations are solidly based on demonstrable facts, including many facts which come directly from the findings or statements of Department personnel.

The charter members of the SMSC believed it was important to identify themselves as Mdewakanton descendents, many of whom were related to the Friendlies who never left Minnesota.  They were proud of their Mdewakanton heritage (Exhibit 4).  The membership criteria were discussed at length with the BIA representative who specifically inquired how the Shakopee reservation residents wanted to handle new members who did not currently reside within the reservation.  They decided on the quarter Mdewakanton blood requirement as a means to perpetuate the particular culture identified with the Dakotas punished after the Dakota War of 1862.  This blood quantum requirement was then placed in the Community's Constitution, and has never been amended by the SMSC membership.  (Exhibit 5)

The BIA, both orally and in written enrollment guidelines, advised the members of the Community to specify in its Constitution the criteria for future membership. Otherwise, the Community would be leaving the criteria for membership vulnerable to change at every vote of the General Council and membership would devolve into a popularity vote controlled by a powerful leader.  (Exhibit 6 at 3-1)  Seeking to maintain its historical character and to avoid such popularity contests, the Community established specific criteria for future membership and specified in their Constitution that any changes in these criteria would have to be reviewed and approved by the Secretary.  Thus, the Community in a democratic and calculated fashion expressly elected to have federal oversight regarding this core issue.

The Constitution also left to the Community the task of developing the enrollment procedures for new members.  The specific requirements of Article II (Membership), Section 1, set the criteria for future non-resident membership.  Section 2 gave authority to the General Council to enact ordinances to establish the enrollment procedures for future members subject to the approval of the Secretary.  (Exhibit 35)  The Constitution provided

for individual "adoptions," but any such adoptions would be subject to Secretarial approval. In 1987, the Community's outside legal counsel expressly opined that ordinary "adoption" ordinances could not be used to bring in individuals that did not meet the Constitutionally prescribed blood quantum requirements unless such ordinances were approved by the Secretary of the Interior in accordance with the review process set forth in the Constitution. (Exhibit 7).

B.       The History Of The Unconstitutional "Adoption" Ordinances

        In 1983, the Community, wishing to maintain its unique cultural and political character as quarter blood Mdewakanton (Dakota) Sioux, drafted and approved an Enrollment Ordinance which created an Enrollment Committee to review and process all membership applications and to verify that applicants qualified as Mdewakanton (Dakota) Sioux under the Community's Constitution.  With the assistance of the BIA and following BIA policies and guidelines, the Community enacted another ordinance in 1987 which directed the Enrollment Committee to screen all current voting members to ensure that they were Constitutionally qualified Mdewakanton Dakotas and met all the requirements for membership.  In 1990, the SMSC Business Council, at the suggestion of the BIA, retained a genealogist, John L. Schade, to conduct independent research and work with the Enrollment Committee to develop a verified list of individuals qualified to receive Court of Claims "Docket 363" distributions which resolved several land claims brought by Minnesota tribes against the Government.  All purported members of the Community, not previously enrolled by appearing on the original 1969 Census, were directed to make application to support their blood degree qualification and ancestry.  This list also inherently provided a determination as to who was then a constitutionally qualified member of the Community.  At that point, there

6

were approximately 60 to 80 individuals that qualified as members of the Community under Constitutional standards.

This verified list of the Docket 363 recipients was then submitted to the BIA which, in effect, certified the research ("1991 Certified List").  The 1991 Certified List did not include certain allies and relatives of Stanley Crooks.  Mr. Crooks wanted to add his supporters to the list because he was seeking to capture control of the Community in order to control the Community's rapidly growing gaming revenues.  During this period of time, the Community's Mystic Lake Casino became one of the largest gambling venues in the United States with annual revenues exceeding $650 million.  Per capita distributions to individuals in the Community increased significantly as a result of those casino revenues.  Unqualified members of the Community brought suit in Tribal Court against individual members of the Enrollment Committee for not including them on the 1991 Certified List.  The Tribal Court enjoined the Enrollment Committee from using the 1991 Certified List until membership issues could be resolved.  As a result, unqualified members were allowed to vote in the 1991 Business Council election and they began to receive per capita distributions.[2]  At this Constitutionally-defective election, Stanley Crooks was elected Chairman of the Business Council[3] by a narrow margin, defeating then-Chairman Leonard Prescott.  That narrow margin of victory came from the unqualified members who were not Shakopee Mdewakanton Dakotas, and who had no right to vote in that election.  Within days of the election, the new leaders destroyed, or had destroyed, all records in the enrollment office in

---

[2] The per capita distributions have grown to over $ 1,200,000 per year.  Payments to unqualified members are in direct violation of the Indian Gaming Regulatory Act (IGRA) which expressly provides that only duly qualified members of a tribe may receive per capita gaming distributions.  25 U.S.C. 2710(b)(3).

[3] The Business Council is comprised of three persons.  Stanley Crooks and his cousin Glen Crooks are still the Chairman and Vice Chairman.

an effort to cover up the fact that the election was based upon votes cast by non-eligible
voters.

The new leadership then embarked on an unconstitutional scheme to take control of
the Community's gaming revenues by adding "members" who were not quarter blood
Mdewakanton (Dakota) Sioux through unconstitutional "adoptions."  At the same time,
qualified applicants meeting the quarter blood requirements were denied membership and in
most instances were banned from the application process.  In time, this illegal "adoption"
process increased the alleged voting membership of the Community from the 60 to 80
originally qualified Mdewakanton (Dakota) Sioux to what is now believed to be about 200
voting members.  This number cannot be verified because the leadership refuses to provide a
current membership list to the members of the Community.

The Department was aware of how the "adoption" process was corrupting the
membership and how it was tied to the tribe's growing gaming revenues.  (Exhibit 8 at 6-7).
In July, 1993 the Minneapolis Area Director expressed concerns to the Field Solicitor that the
SMSC plans would allow non-members and non-Indians to receive per capita payments in
contravention of the Indian Gaming Regulatory Act ("IGRA") (Exhibit 11).  The BIA then
quoted with alarm the leadership's own words admitting that the per capita list was not based
on whether an individual was enrolled in the Community but rather based upon who "the
tribe chose to list."  The BIA then attempted to persuade the SMSC to come into compliance
with the IGRA (Exhibit 8 at 6-7).[4]  Instead of complying with IGRA, the SMSC leadership

---

[4] This history is detailed in the Brief of July 31, 1998, Barbara N. Coen, Division of Indian Affairs,
Exhibit 9, at pp. 1-3.  See also, letter to Minneapolis Area Office from Mariana Shulstad, dated July 28, 1993.
The Field Solicitor notes: "[a] number of the individuals listed are not members of the community; some of
them are not Sioux Indians; in fact, at least one is allegedly not Indian at all."  She finds "[p]ayments to
individuals who are not members of the Community, unless they constitute a recognized charity or a local unit
of government, are absolutely prohibited by the statute." (Exhibit 10)  On July 30, 1993, the Area Director
requested "intervention of the Justice Department to require compliance of the Shakopee Mdewakanton Sioux

initiated the adoption ordinance strategy at issue here which diluted the power and control of the qualified members of the Community.

The first attempt to pass an adoption ordinance occurred on Oct 27, 1993 ("First Adoption Ordinance").   The ordinance, by eliminating the blood quantum requirement, would have allowed those unqualified individuals on the per capita list at that time to continue receiving their distribution payments.  The adoption ordinance attempted to eliminate the Constitutional blood quantum requirement which was the *sine qua non* of the Community and sought to adopt into membership a list of people who were not qualified under the Constitution as Mdewakanton (Dakota) Sioux.  The list included 41 adults and 124 children who were principally related to the Crooks family.  The First Adoption Ordinance initially failed to pass at the meeting of the General Council.  After the vote failed, most of the Constitutionally-qualified members of the Community left the meeting place, being told that the vote was over.  Thereafter, the leadership called for a second vote of their allies that remained.  After this second "vote," the leadership declared the First Adoption Ordinance enacted.

Because the Community had expressly requested this protection in its Constitution, the First Adoption Ordinance was submitted for approval to the Department because it changed the core membership criteria.  On November 12, 1993, the Minneapolis Area Office of the BIA correctly disapproved of the First Adoption Ordinance as an illegal attempt to alter the Constitution's membership requirements, and further disapproved the ordinance as an attempt to enroll "wholesale" a group of individuals without determining individual membership eligibility in violation of the Constitution. (Exhibit 12).

---

Community with 25 U.S.C. 2710 (b) (3), which limits per capita payments to members of the Indian tribe." (Exhibit 11)

But the leadership led by the Crooks family was not to be stopped, and on November 30, 1993, while the ink was still wet on the BIA's denial of the First Adoption Ordinance, the SMSC enacted Ordinance 11-30-93-002 ("Second Adoption Ordinance"). The Second Adoption Ordinance also attempted to eliminate the Constitutional blood quantum requirement for membership so that unqualified applicants could become members. In violation of the Constitution, the unqualified family members and allies of Stanley Crooks -- the very individuals whom the leadership had attempted to illegally adopt "wholesale" with the First Adoption Ordinance – were allowed to vote on the Second Adoption Ordinance just eighteen days after the BIA found that they were not members of the Community. The Second Adoption Ordinance passed by a single vote, and the illegal votes of unqualified members were cast in favor of the ordinance. This vote and every SMSC vote thereafter was inconsistent with the principle of tribal self-determination because the constitutionally qualified tribal <u>members</u> were no longer deciding tribal membership issues or making tribal decisions.

Per the Constitution, the Second Adoption Ordinance was again submitted to the BIA, and on December 13, 1993, the Area Director once again disapproved the Second Adoption Ordinance as an inappropriate method of attempting to change the Community's Constitution. The Area Director concluded that the Ordinance "circumvents the Constitution by attempting to accomplish by ordinance what the Community's Constitution requires to be done by Constitutional amendment." (Exhibit 13). The Area Director further disapproved the Second Adoption Ordinance on substantive grounds because such a broad adoption ordinance "would affect the very fabric of the Community." <u>Id</u>. The Area Director's opinion letter also reiterated that it was current Department policy to review such attempts to change

a tribe's core membership criteria as part of its Congressionally-mandated responsibilities.

Id.  The Area Director said that the changes sought by the Adoption Ordinance must come

about by the qualified members amending the Constitution.  Id.

Under the Community's Constitution, an appeal of such a decision can only proceed

if the membership votes to authorize an appeal.  This provision is designed to ensure that the

legal position in the appeal reflects the will of the Community.  Undeterred by Constitutional

requirements, the leadership had its attorneys appeal the Area Director's decision to the

Interior Board of Indian Appeals ("IBIA") without the required approval of the General

Council.  The Plaintiffs in this case sought to intervene in that appeal but they were denied

the right to participate.  25 IBIA 296, 304 (1994).[5]  On February 8, 1995, an administrative

law judge at the IBIA -- without hearing from the Plaintiffs and without having the benefit of

the full history and facts -- reversed the Area Director's disapproval of the Second Adoption

Ordinance and remanded the matter back to the Area Director with instructions to approve

that unconstitutional ordinance which had passed solely by virtue of votes from unqualified

members.  However, this approval of the Second Adoption Ordinance was found to be

invalid by Assistant Secretary of Indian Affairs Gover after a suit was brought by the

Plaintiffs against the Department regarding the Second Adoption Ordinance.  Feezor v.

Babbitt, 953 F. Supp. 1 (D.D.C. 1996).

B.     Plaintiffs' Initial Challenge To The Department's Failure To Invalidate The Illegal
       Adoption Ordinances

In July 1996, Plaintiff Cecilia St. Pierre and her elder sister, Winifred Feezor,

filed suit in federal court in the District of Columbia against officials of the Department  on

behalf of themselves and other Community members ("Feezor Plaintiffs").  The Feezor

---

[5] Cecilia M. St. Pierre tried to be an Intervenor in that IBIA matter.  She was a plaintiff in the Feezor matter and an Intervenor in the Blood Quantum Determinations discussed infra.

Plaintiffs challenged the Department's "approval" of the Second Adoption Ordinance because (a) it was inconsistent with the Constitution, (b) it was the result of illegal voting by unqualified members, (c) it resulted from an illegal "appeal" to the IBIA which had not been authorized by a vote of the General Council, and (d) the IBIA lacked jurisdiction because the 90 day time limit for reversal of an Area Director's decision had expired.  The SMSC participated as an amicus in the matter.  Judge James Robertson rejected the Government's subject matter jurisdiction, Rule 19, standing, and reasonableness defenses – defenses which parallel the defenses raised in the instant Motion to Dismiss.  After rejecting those defenses, Judge Robertson remanded the case to the IBIA for consideration and explanation of three issues:  (1) whether the IBIA exceeded the 90 day time limit to review the Second Adoption Ordinance; (2) whether the Community properly authorized the appeal from the decision of the BIA Area Director to the IBIA; and (3) whether the Second Adoption Ordinance was validly passed by Constitutionally qualified and eligible voting members of the Community. Feezor, 953 F. Supp. at 7.  This last request reflected Judge Robertson's concern that the process of allowing non-members to vote was corrupt because it diluted the power of the qualified members to control how the Community would be governed and its resources distributed.  Id. at 1.

Judge Robertson's opinion made clear that the Second Adoption Ordinance would not pass federal scrutiny.  The SMSC leadership reacted by passing yet another adoption ordinance ("Third Adoption Ordinance") trying to circumvent or moot Judge Robertson's decision.  The Third Adoption Ordinance was substantively identical to the Second Adoption Ordinance.  By its terms, the Third Adoption Ordinance incorporated wholesale the Second

Adoption Ordinance, while purporting to "amend" the Second Adoption Ordinance.[6] Individuals who had illegitimately been adopted into membership under the illegal Second Adoption Ordinance, as well as other individuals who were not qualified, voted on the Third Adoption Ordinance.[7]

Per the Constitutional requirements, the Third Adoption Ordinance was submitted by the SMSC for approval to the Office of Area Director during the pendency of the Feezor remand and the Third Adoption Ordinance fell into a legal Alice-in-Wonderland. As set forth above, the Area Director had twice disapproved the very same ordinance because of its patently unconstitutional character and that the "ordinance" process was being used to circumvent the Constitutional process. This time, however, the Office of the Area Director was handcuffed by the IBIA administrative law judge's earlier erroneous reversal of his Office's invalidation of the Second Adoption Ordinance and was forced on May 23, 1997 to "approve" the Third Adoption Ordinance. But the Area Director qualified the approval, stating that the Third Adoption Ordinance was "substantially the same as" the Second Adoption Ordinance. Inexplicably, the Area Director did not mention or address the significance of Judge Robertson's pending remand to the Department regarding the propriety of the near-identical Second Adoption Ordinance and how that pending remand impacted the "approval" process as to the identical Third Adoption Ordinance. The BIA attorneys later noted this deficiency and observed that the Area Director approved the Third Adoption Ordinance "without an analysis of the procedural issues raised in the administrative record and by the court's remand of the second ordinance." (Exhibit 17 at 1).

---

[6] The Area Director who approved the Third Adoption Ordinance and Solicitor Leshy have both acknowledged the identical character of the ordinances. (Exhibit 14 at 1; Exhibit 15 at 8).

[7] The Office of the Solicitor of the DOI had previously stated that "individuals who do not meet constitutional requirements for membership should not be allowed to vote in Tribal matters. To do so, compromises the vote and may preclude Secretarial approval of future ordinances." (Exhibit 16 at 2).

DOI Secretary Bruce Babbitt had ninety days under the Community's Constitution within which he could have reversed the Area Director's initial approval of the Third Adoption Ordinance.  The remand ordered by Judge Robertson as to the legality of the identical Second Adoption Ordinance was pending as this 90-day clock was running.  Despite its patent Constitutional flaws, the use of unqualified voters and Judge Robertson's remand regarding the illegality of the Second Adoption Ordinance, Secretary Babbitt failed to take any such action within that time period, thereby tacitly approving the Area Director's decision to "approve" the Third Adoption Ordinance.  It must be noted that during the pendency of this matter a lobbyist for the Community arranged a meeting between Chairman Crooks and the Chairman of the DNC on June 4, 1996 regarding the Community's adoption ordinances.  According to the Department's "Final Report of the Independent Counsel In Re: Bruce Edward Babbitt, August 22, 2000," the Community brought $20,000 to the June 4 meeting as a donation to the Democratic National Committee ("DNC") and in a memorandum stated the tribe wanted to raise one substantive issue with the DNC Chairman: "the Department of Interior's possible reconsideration of the tribe's adoption ordinance."  In the next three and one-half months the Community would contribute another $75,000 to the DNC. Id.

Thereafter, on the remand ordered by Judge Robertson, SMSC's attorneys argued to the Department that the matter was now moot due to the approval of the Third Adoption Ordinance.  However, in a May 22, 1998 Memorandum Opinion Solicitor John Leshy,[8] the Department's chief lawyer, found that the passage of the Third Adoption Ordinance did not moot Judge Robertson's order and noted that, because the Third Adoption

---

[8] John Leshy came to the Department in 1993 as a highly respected expert in Natural Resources, Public Land and Indian law.  He taught Federal Indian Law for many years as a professor at the University of Arizona.  He currently is teaching as a Visiting Professor at the Harvard Law School Indian Law Program.

Ordinance was substantively the same as the Second Adoption Ordinance, it was, at best, merely an amendment to the Second Adoption Ordinance and not a stand alone ordinance. (Exhibit 15 at 8).  Solicitor Leshy expressly found that the Third Adoption Ordinance was "dependent upon" the Second Adoption Ordinance, meaning that the "validity of the Third Adoption Ordinance itself rests on the outcome regarding the Second Adoption Ordinance." Id. at 13, 23.  Therefore, the Department's own Solicitor tied the validity of the Third Adoption Ordinance to the validity of the Second Adoption Ordinance.  The Solicitor's Opinion also reiterated the persistent concern about unqualified participants voting on the Third Adoption Ordinance.  Id. at 28.  In short, the DOI's Solicitor opined that if the Second Adoption Ordinance failed, the Third Adoption Ordinance must also be invalid.  The Solicitor also correctly foresaw what would happen if the Department ignored the Third Adoption Ordinance on remand -- Plaintiffs would return to Court regarding the Department's approval of the Third Adoption Ordinance.  Id. at 28.  In a separate legal memorandum, the BIA's attorneys supported the Solicitor's Opinion about the relationship between the Second and Third Adoption Ordinances.  (Exhibit 18 at 1-2, 11-12, 16-17). Both the Solicitor and the BIA attorneys agreed that the passage of the Third Adoption Ordinance did not moot the DOI's obligation to address the points which Judge Robertson ordered the Department to address, including the issue of the use of unqualified voters.

Although the remand was for a determination by the IBIA of three specific issues, Assistant Secretary Gover – without leave of court – decided that he would respond.  The Assistant Secretary sat on the matter for over two years before issuing his decision on February 2, 1999, finding that the IBIA was without authority when it approved the Second Adoption Ordinance because the 90 day time period to review ordinances had expired.

However, the Assistant Secretary then claimed, despite the reasoned legal opinion of the Solicitor and the BIA attorneys to the contrary, that he did not have to reach the other two issues expressly remanded to the IBIA by Judge Robertson -- (1) whether the adoption ordinance was validly enacted by qualified members, or (2) whether the IBIA appeal was properly authorized.  Getting the Assistant Secretary to side-step the election issue in the remand Order was critical to the current leadership of the SMSC because consideration of the actual facts as ordered by Judge Robertson by an independent administrative law judge would call into question the legitimacy of every vote taken since the Second Adoption Ordinance and raise questions about the leadership's violations of IGRA by providing gaming revenues to individuals who were not lawful members of the tribe.

The Government admits that the Assistant Secretary did not address the remanded questions because he "took issue" with Judge Robertson's underlying legal assumptions.  Memorandum In Support of Motion for Judgment on the Pleadings, filed April 1, 2004, at 30 (Docket Entry 11).  Normally the losing party's choices when it disagrees with the Judge's reasoning are to appeal or comply.  Apparently, the Assistant Secretary determined that he did not have to risk the uncertain outcome of an appeal if he could grab control of the remand and then sidestep it.  Moreover, it was risky to have the IBIA involved because the IBIA, given the rather clear evidence already assembled by the BIA, might have made findings which did not suit the Assistant Secretary's agenda.  Count II of the Second Amended Complaint addresses whether Assistant Secretary Gover had the right to take the remand issues away from the IBIA without Court permission and then, after usurping the IBIA's role, to ignore critical parts of the Order merely because he questioned Judge Robertson's legal reasoning.

Even though the Second Adoption Ordinance was disapproved following the remand, the Department has not taken any action to enforce that disapproval.  The Department also allows the Third Adoption Ordinance (which is really the disapproved Second Adoption Ordinance) to stand despite the fact that the Third Adoption Ordinance is patently unconstitutional, was voted on by unqualified individuals, and suffers from the same legal defects as the Second Adoption Ordinance.  The Department, against the advice of its Solicitor, also allowed the Third Adoption Ordinance to be "approved" during the pendency of the remand on the legality of the Second Adoption Ordinance.  In doing so, Defendants sabotaged the effect and intent of Judge Robertson's remand Order which was to establish a record so that there could be a determination as to whether the wholesale adoption process was lawful and whether unqualified individuals were participating in Community affairs and receiving Community resources in violation of the principle of tribal self-determination.  The Department then, in an extraordinary move, removed the BIA attorneys from the case as a result of their support of the Plaintiffs' position on these issues.  Thus, the Department now has stifled the Department staff most familiar with the facts and history of the case and who disagree with the Assistant Secretary's remand decision.

D.      The Blood Quantum Determinations

After the Area Director disapproved the Second Adoption Ordinance in 1993, the SMSC leadership led by the Crooks family requested that the Department conduct a Secretarial Election on a proposed revision to the Community's Constitution to amend the membership criteria to eliminate the blood quantum requirement.  This election was held on April 19, 1995 with many of the unqualified Crooks family members improperly allowed to vote.  Qualified members of the Community objected and on June 2, 1995, Ada Deer, the

Assistant Secretary of Indian Affairs, invalidated the election results and found that unqualified individuals had voted in the Secretarial Election.  She ordered a new Secretarial election, this one being limited to qualified voters.  In rejecting the election results, the Assistant Secretary reiterated the Department's long-standing policy that individuals voting on an amendment to a tribe's Constitution must be eligible to vote and that there is a strong federal interest in such matters. (Exhibit 19 at 3).

The Assistant Secretary concurrently requested that an administrative law judge be appointed to take evidence and make blood quantum determinations for the 23 individuals whose right to vote had been challenged.  These determinations would be for purposes of voting in the Secretarial Election and for Docket 363 distributions.  The 23 involved were primarily relatives of the leadership.  These determinations were to be made before the next Secretarial election. (Exhibit 19 at 9-10).

Later, when the IBIA administrative law judge erroneously reinstated the Second Adoption Ordinance, the SMSC leadership recognized that they had now effectively amended the blood quantum requirements of the Constitution by the approval of the Second Adoption Ordinance.  Moreover, they knew that their blood quantum position could not get a majority vote in a federally-supervised election where only qualified members of the Community would be allowed to vote.  As a result, the SMSC leadership withdrew the request for a Secretarial Election on the constitutional amendment.  This tactic of canceling the Secretarial Election took the choice of whether to alter the blood quantum criteria out of the hands of the membership, a tactic completely at odds with the principle of self-determination.

Over the course of this nine-year period, four administrative judges have been assigned to make these blood quantum determinations.  Final determinations have been made in only ten subdockets; the remaining subdockets are still pending, resulting in a nine-year delay.  Despite the obvious genealogical errors made by the administrative law judge in his initial ten determinations, as noted by both the attorneys for the BIA and Intervenors, the Assistant Secretary Kevin Gover prematurely approved the initial ten subdockets before the findings on the remaining subdockets had been completed.  Intervenors and the attorneys for the BIA objected to this premature approval of the first ten subdockets. The BIA attorneys also strongly objected to the way the administrative law judge handled these blood quantum determinations and filed objections outlining how these determinations violate the long standing policies and practices of the DOI.

The remaining dockets remain undecided after nine years, despite a recent effort by an outgoing Department political appointee to illegally usurp the power to "decide" the matter in favor of the SMSC while she was negotiating for employment with SMSC's law firm.  Her *ultra vires* "decision" is clouded with a conflict of interest.  (See discussion, infra, at 43).  While these cases have languished, the individuals involved in the blood quantum appeals have continued to vote on Community issues and to illegally receive per capita distributions.  Plaintiffs have been injured by this delay because the recognition of the individuals dilutes the Plaintiff's voting power on Community matters, alters the governance of the Community, dilutes their Docket 363 distributions, and dilutes their per capita distributions of the Community's funds.

**ARGUMENT**

The illegally enacted "adoption" ordinances have dramatically altered the character of the Community, causing the Community to now be governed outside the requirements of the Community's Constitution and federal laws such as the Indian Gaming Regulatory Act. Unfortunately, the Government's Memorandum -- against the position of the Department's career staff, its attorneys, and contrary to the Department's position in similar cases -- now defends the Department's inactions by wrongly trivializing as anachronistic and paternalistic its trust responsibility to preserve the rights of tribal members from illegal assaults on their voting rights and membership criteria.  But the mantra of "tribal self-determination" does not give tribal leaders a free pass to undermine the Constitutional criteria and processes regarding membership criteria when, as here, the members expressly requested federal supervision and approval of any alteration of core membership criteria.  Ironically, just two years ago in the <u>Seminole</u> <u>Nation</u> cases in this judicial district, the Department forcefully argued that it still has the statutory and trust responsibility to prevent such unconstitutional and unfair assaults on a tribe's historical membership criteria.  Inexplicably, the political appointees at the Department (but not the career employees, BIA attorneys and the Department's chief legal officer) seem to have temporally shelved that responsibility in favor of the current SMSC tribal leaders at the expense of true <u>tribal</u> self-governance and self-determination by the lawful Community <u>members</u> of the SMSC.

This case seeks judicial review of the arbitrary and capricious approval of the Third Adoption Ordinance by the political appointees of the DOI who in the aftermath of substantial campaign contributions by tribal leaders have made a decision that is unfounded in the law and fact and which is inconsistent with the Department's stated policy and against

the position of its career staff and attorneys.  As such, this case falls squarely within the role

Congress intended for the federal judiciary in reviewing agency decisions to ensure that they

are based upon proper record considerations and not extra-record political influences.

## I.     THIS APA MATTER PROPERLY BELONGS BEFORE A FEDERAL COURT

The dispute involves the Department's violations of the APA by arbitrarily and

capriciously approving an "ordinance" (a thinly disguised constitutional amendment) in

violation of the statutory and trust obligations that have been imposed on the Department by

both statute and the case law to protect the tribal members from unconstitutional membership

changes.[9]  The federal involvement with this matter stems from an express provision in the

SMSC Constitution, voted upon by the tribal members, which provides that the Department

must review and approve any changes in the membership criteria.  Therefore, all of the

Memorandum's assertions about Plaintiffs' case being an assault on tribal sovereignty are

empty rhetoric.  The members asked for this very review.  Indeed, Plaintiffs' complaints

about the use of such "ordinances" to bypass the Constitution and why there is a federal

interest in this matter echo the very position of the Department's Area Directors, the BIA

attorneys and the Department's own Solicitor.  Thus, the Government's Memorandum is

mostly an argument with the Department's own policy.

Plaintiffs are not complaining about "interpretation" because the Community's

Constitution is clear on the membership's criteria and who may enjoy the Community's

resources.  This case is no more about "interpretation" of the tribe's Constitution than Feezor,

where the Department similarly tried to side-step its responsibility to invalidate the Second

Adoption Ordinance by claiming that matter was merely an intra-tribal spat over

---

[9] See discussion at pp. 39, infra.

interpretation of the tribe's Constitution that the federal court should not entertain.  Judge

Robertson rejected that argument and succinctly identified why the  case belonged in federal

court:

> Plaintiffs are members of a federally recognized tribe and are among the
> intended beneficiaries of the IRA.  Furthermore, the IRA's express provision
> for Secretarial approval of tribal constitutions and by-laws has been extended
> by BIA's policy of including provisions for Secretarial approval of substantive
> ordinances in tribal Constitutions.

Feezor, 953 F. Supp. at 3.  The Department did not appeal any of Judge Robertson's

conclusions regarding the jurisdiction of the federal court regarding approval of the Second

Adoption Ordinance.  If there were sufficient federal interest in the Second Adoption

Ordinance, then there is sufficient federal interest in the identical Third Adoption Ordinance

which suffers from the same defects.

A.      The Department's Position Is Contrary To Decisions From This Circuit And
        This District

Notwithstanding the Government's reliance on the general statements regarding tribal

self-determination from *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978),[10] there remains

a strong federal interest in tribal attempts to amend a tribe's IRA Constitution because

Congress intended that the federal government protect the integrity of tribal membership.

See Morris v. Andrus, 640 F. 2d 404, 415 (D.C. Cir. 1981); see also Cheyenne River Sioux

Tribe v. Andrus, 424 F. Supp. 448 (D.S.D. 1977), aff'd, 566 F. 2d 1085 (8th Cir. 1977).

Department memoranda repeatedly reaffirm this.  (Exhibits 12, 13, 15).  Under its trust

responsibilities, the BIA must respect, protect and properly construe tribal constitutions.  See

Harjo v. Kelppe, 420 F. Supp. 1110 (D.D.C. 1976), aff'd, sub nom, Harjo v. Andrus, 581 F.

---

[10] Martinez, which did not involve a provision in the tribe's IRA Constitution granting federal review of
membership changes, merely holds that absent federal legislation or a tribal constitutional process, federal
courts may not conduct a direct review of a tribe's membership criteria.  Martinez makes clear that in the very
circumstances presented here – a tribe with a federal review provision in its constitution – that tribal members
can seek federal intervention.  436 U.S. at 66.

2d 949 (D.C. Cir. 1978).  Indeed, this judicial district has a long history of upholding that

principle post-*Martinez*:

> The Government is charged with the responsibility of safeguarding, from both
> external and internal threats, the political existence of Indian tribes, including
> protecting and guaranteeing tribal self-government and the political rights of
> Indians.

Milam v. United States, 10 ILR 3013 (D.D.C. 1982).  Milam involved a disputed election

and the BIA's alleged violations of the APA in approving the results of that election.  Tribal

leaders were removed in a procedure that allegedly violated the tribe's constitution but the

BIA nevertheless approved.  The removed officers claimed that the BIA's acceptance of the

election was arbitrary and capricious in violation of the APA and that the BIA had no

authority to concern itself with such internal tribal matters.  Judge Flannery rejected the

claim that tribal disputes are beyond the realm of the APA and found that the trust

responsibility of the Department includes the obligation to ensure that tribal actions are taken

in compliance with the tribal constitution and that the BIA refrain from recognizing any

action taken in violation of the constitution.  Id. at 3015.  The Department continues to rely

upon and cite Milam as controlling law and good precedent in other cases,[11] but ignores

Milam in its instant Memorandum.

 This case involves the continuing federal interest in preserving the historical integrity

of the tribe through the Constitutional process.  When it comes to attempts to alter

membership criteria, the matter is not a mere "intramural dispute" devoid of federal interest,

as the Government's Memorandum wrongly labels this matter.  As Judge Colleen Kollar-

Kotelly recently explained in her Memorandum Opinion in one of the Seminole Nation cases,

attempts to change the core membership criteria of an Indian tribe still require approval of

---

[11] See, e.g., Memorandum In Support of Defendants' Cross-Motion for Summary Judgment, dated February 8,
2001 Seminole Nation v. Babbitt, Civ. No. 00-238K (CKK), at 13.  (Exhibit 20)

the Secretary of the Interior, when, like here, there is an IRA constitution.  Judge Kollar-

Kotelly agreed with the Department's position that this critical trust and statutory

responsibility of the federal government has not been abandoned as part of the grant of

increased Indian sovereignty.  Seminole Nation of Oklahoma v. Norton, (Exhibit 21 at 31).

That case involved an attempt by the Seminole Nation to amend its Constitution to exclude

the black "Freedmen" from membership in the Seminole Nation.  Per the Constitutional

requirements of the Seminole Nation, the amendment was submitted to the BIA for approval.

The BIA rejected the amendment because the changes would "fundamentally affect the

composition of the governing body of the Seminole Nation." Memorandum Opinion,

(Exhibit 21 at 15).  There, the Department forcefully argued less than two years ago that its

trust responsibilities still obligated it to safeguard the constitutionally established

membership criteria, that federal oversight on that core issue did not impinge on the limited

grant of tribal sovereignty, and that Martinez did not change that responsibility.

       The concerns expressed in the Seminole Nation cases apply equally here because the

SMSC adoption ordinances undermine the Constitutionally established membership of the

SMSC and would also "fundamentally affect the composition of the [Community's]

governing body."  Indeed, the BIA itself has stated these ordinances "alter the very fabric of

the Community."  (Exhibit 13 at 1).  Tellingly, the Government's instant Memorandum does

not contest the BIA's conclusions regarding the destructive impact of the ordinances

challenged here.  Plaintiffs believe that preservation of the fabric of their Community is just

as deserving of federal protection as was preservation fabric of the Seminole's community.

The Government's Memorandum  does not explain why preservation of the historical

integrity of the Seminole Nation is of federal concern but preservation of the historical integrity of the SMSC is not of federal concern.

Judge Reggie Walton also later addressed this issue in a parallel <u>Seminole Nation</u> proceeding when the Seminole Nation asserted -- like the Government's Memorandum now claims -- that there was no longer a federal interest in resolving membership disputes for tribes with an IRA Constitution.  In that matter, the very same Department officials involved in this case took the <u>opposite</u> position they take here and argued that the federal government's continuing trust responsibility obligated the Department to prevent unconstitutional attempts to alter the historical membership criteria of the Seminole Nation. Judge Walton agreed with the Department that there was a federal interest in such cases and observed that the "Secretary of the Interior is charged not only with the duty to protect the rights of the tribe, but also the rights of individual members." <u>The Seminole Nation of Oklahoma v. Norton</u>, 223 F. 2d 122, 146 (D.D.C. 2002).  Judge Walton re-affirmed that there remains a strong federal role when the majority of the tribe attempts to subvert a tribe's constitution.  <u>Id</u>.  Judge Walton further noted that "The DOI has the authority and the responsibility to ensure that the [Tribe's] representatives … are valid representatives of the [Tribe] as a whole."  <u>Id</u>. at 140.  This responsibility includes the duty to ensure that a tribe adheres to it own constitutional mandates.  <u>Id</u>. at 146.  In this case, Plaintiffs are adopting the very position taken by the Department in that case and accepted by Judge Walton -- there remains an important continuing role of the federal government to ensure that the historical and constitutionally-established character of an Indian tribe is not undermined by illegal means.

We must note the striking and unexplained flip-flop in the Government's position on the law and policy regarding the SMSC as compared to the Department's statements about the law and policy just two years ago in the <u>Seminole Nation</u> cases.  In legal memoranda in the <u>Seminole Nation</u> cases the Department (a) emphasized its continuing trust obligations in a fashion which sharply contrasts with its instant Memorandum (Exhibit 22 at 17-18), (b) emphasized the Department's responsibility to ensure that the tribe's governing body acts in accordance with the tribe's constitution (Exhibit 23 at 3-4), (c) reiterated its responsibility to interpret a tribe's Constitution in exercising its trust responsibilities (Exhibit 24 at 4), (d) argued against giving deference to the Seminole Nation's interpretation of its Constitution (Exhibit 23 at 3), (e) observed that "ordinances" cannot be used to end-run the constitutional process (Exhibit 24 at 5-6), and (f) argued that a majority vote cannot override the clear terms of a tribe's constitution (Exhibit 24, at 8).  Surely the Department is not saying that all the things it just told Judges Walton and Kollar-Kotelly were wrong and that the <u>Seminole Nation</u> cases were wrongly decided.  The Government's Memorandum has not explained why these important and still vibrant principles should be suddenly disregarded.

B.     <u>The Government's Position Is Contradicted By The Department's Attorneys and Its Solicitor</u>

The claim that there is no federal interest in this dispute is belied by the legal opinion of Solicitor John Leshy, the Department's highest legal officer, who identified why there is a strong federal interest in <u>this</u> <u>very</u> matter and why this is <u>not</u> an internal tribal dispute about which there is no federal interest.  In his Opinion regarding the scope of remand in <u>Feezor</u>, Solicitor Leshy concluded:

> <u>The</u> <u>dispute</u> <u>is</u> <u>not</u> <u>purely</u> <u>internal</u>, but implicates the Department's exercise of its review authority under the Community's Constitution.  Furthermore, the dispute also appears to affect federal interests, because the Department has

> taken the position that under the Community Constitution, no distinct classes
> of membership are created to distinguish between individuals who are
> qualified to participate in purely tribal matter, and those who are qualified to
> participate in federal matters, such as a Secretarial election.

(Exhibit 15 at 3) (emphasis added).  In rejecting the argument that the propriety of the

SMSC's adoption ordinance should be considered by the tribal court, not the federal

government, Solicitor Leshy further concluded:

> The issues regarding the validity of the Second Adoption Ordinance are ones
> presently before the Department -- not the tribal court -- because of the
> Secretary's role under the Constitution to review tribal adoption
> ordinances…."
>
> Although the Department must take care not to interfere with tribal
> sovereignty and the prerogatives of the Community to govern itself and
> determine membership, the General Council's authority remains subject to the
> Community's Constitution, which affords the Department the authority to
> review tribal adoption ordinances and requires Departmental approval for
> them to become effective."

Id. at 17-18 (emphasis added).  The Government's Memorandum does not even attempt

to rebut Solicitor Leshy's Opinion which fully concurs with Plaintiffs' position on

whether this matter belongs in federal court and which correctly states the law on this

issue.

    The Government's position is also inconsistent with the prior filings of the BIA

attorneys in the Solicitor's Office who represented the BIA's interests during the various

administrative proceedings involving the Second and Third Adoption Ordinances.  The

attorneys for the BIA found that there were at least four "distinct federal interests" in the

issues remanded by Judge Robertson in Feezor:

> The Assistant Secretary's decision on the validity of the Second Adoption
> Ordinance will be relied upon by the BIA for resolving any challenges raised
> by tribal members as to voters at future IRA elections, for future distributions
> of docket 363 trust funds, for resolving the government's response to tribal
> election disputes, and will be used by the NIGC and the U.S. Attorney's

Office should there be a decision to enforce the per capita provisions in IGRA.[12]

(Exhibit 15 at 9).  Again, the Memorandum ignores the contrary legal conclusions of the BIA attorneys who are in a superior position to recognize the federal interests in this matter.

## II.     THE SMSC CONSTITUTIONAL MEMBERSHIP CRITERIA CANNOT BE ELIMINATED BY "ORDINANCES"

The Memorandum argues that the Department is powerless to address the Third Adoption Ordinance because Article II, Section 2 of the Constitution provides that the Community has the power, subject to approval from the Secretary, to pass resolutions or ordinances governing future memberships and adoptions by the Community.  This new interpretation of Section 2 would render Section 1 meaningless and this interpretation is one the Department itself has heretofore correctly rejected.  (Exhibits 12 and 13).  The Government's new and self-serving interpretation is also belied by a historical fact.  The SMSC did not use the "adoption" process to bring in new members in a wholesale fashion when gaming revenues were not an issue.  The advent of the wholesale "adoption" process coincided with the current leadership's attempt to wrest control of the tribe's huge gaming revenues.  Moreover, there is an express legal opinion from the tribe's legal counsel which directly contradicts the Government's new view of the tribe's Constitution.  (Exhibit 7).

The Department actively participated in the development of the Community's Constitution and the Community used the BIA manuals regarding formation and implementation of BIA Constitutions.  The Department's Manual sets forth the proper

---

[12] This last comment reflects the BIA staff's recognition that the SMSC is violating IGRA by diverting the tribe's gaming resources to the unqualified "adoptees."

interplay between Section 1 (the constitutional provisions on membership criteria) and

Section 2 (the power to pass ordinances governing enrollment and adoptions processes):

> Tribes that have adopted a constitution will usually find their basic
> membership requirements established in the membership provision of the
> constitution, which was voted on by all members of the tribe. The
> constitution may also provide for an enrollment ordinance to be passed. An
> enrollment ordinance governs the more specific procedures and requirements
> for enrollment, and is usually voted on by the Tribal Council or other
> governing body.

(Exhibit 6 at 3-1) (emphasis supplied)  Thus, it is plainly incorrect for the Government's

attorneys in 2004 to now interpret Section 2 as authorizing alteration of the specific

membership criteria in Section 1 by an ordinary "ordinance" when the Department's position

to this point has always been the opposite.  For example, the Area Directors who disapproved

the adoption ordinances recognized that Section 2 "ordinances" cannot be used to do an end-

run around the specific membership criteria in Section 1 of the Constitution. This reflected

the heretofore unqualified position of the Department.  (Exhibits 12 and 13).  The

Department reaffirmed this long-standing position in legal memoranda in the Seminole

Nation cases. (Exhibit 24 at 5-6).  But the Government now seems to have flip- flopped, and

by the Department's argument *du jour*, the Seminole Nation ought now be able to easily

circumvent the Department's decisions protecting the black Freedman by re-labeling those

disapproved Constitutional amendments as "ordinances."  After all, that is exactly what

happened in this situation and the Government's Memorandum now seems to be saying that

such differences in label are critical for federal jurisdiction.  Plaintiffs ask that the

Department be held to a consistent and lawful position.

### III.    THE ISSUES RAISED BY THE SECOND AMENDED COMPLAINT DO NOT BELONG BEFORE THE TRIBAL COURT

When the Second Adoption Ordinance went before Judge Robertson he correctly did not defer to the tribal court and this Court likewise should not defer to the tribal court with respect to the lawfulness of the Department's approval of the Third Adoption Ordinance.  The BIA attorneys also expressly argued that deference to the tribal court was not appropriate as to the lawfulness of the Second Adoption Ordinance, as that was a question of federal law.  See Exhibit 25 at 7-8;  See also Milam, 10 ILR at 3015.  Moreover, the tribal court has no jurisdiction to determine whether an agency of the federal government complied with the remand Order of Judge Robertson.  That issue is the sole province of the federal court.

Moreover, the SMSC tribal court is presently structured with a strong institutional bias in favor of the leadership faction.  Two of three judges of the SMSC Tribal court, John Jacobson and Henry Buffalo Jr., are partners at the law firm Jacobson, Buffalo, Schoessler & Magnuson LTD ("the Jacobson Firm").  This firm is tribal counsel for the Prairie Island Community.  The law firm BlueDog Olson and Small, P.L.L.P. (the "BlueDog Firm") represents the SMSC leadership in matters before the SMSC tribal court.  In the adjacent Prairie Island Mdewakanton Tribal Court, these individuals/firms reverse positions.  In the Prairie Island tribal court attorneys with the BlueDog Firm serve as the tribal court judges; attorneys with the Jacobson Firm represent the tribe.  Thus, when Plaintiffs request redress of their grievances against the leadership faction in the SMSC tribal court, Messrs. Jacobson

and Buffalo are asked to rule against the very attorneys who will later rule on positions they

advance on behalf of their clients in the Prairie Island tribal court.[13]

## IV.    THERE ARE NO RES JUDICATA OR CLAIMS PRECLUSION ISSUES

The Memorandum completely mischaracterizes the prior litigations and who were the

winners and losers.  The undisputed fact is that it was the Plaintiffs that prevailed on what is

the critical point of all their matters- - the Second Adoption Ordinance is invalid.

Unfortunately, even though the Plaintiffs prevailed, this process has gone on because of the

Department's feet-dragging and failure to comply with the Feezor decision and the SMSC's

passage of the Third Adoption Ordinance as a procedural ploy to circumvent Judge

Robertson's decision.   Plaintiffs, as the true guardians of the cultural heritage of the Tribe

and advocates of tribal self-determination with the support and encouragement of many other

qualified members, ought to be commended, not criticized, for their persistence in the face of

the delay and all the procedural obstacles that have been thrown in front of them by the

Department and the current SMSC officials in their quest to capture control of the casino

revenues.  Plaintiffs can hardly be pointed as chronic complainers, carrying on a meritless

campaign.  After all, they prevailed before Judge Robertson and they -- and not the attorneys

defending the Department -- are advocating positions which echo the positions of the

Department's career employees, the BIA attorneys and the Department's highest legal

officer.  It is the Department political appointees that are making decisions that are contrary

to the law, in conflict with established Department policy, and in defiance of the express

terms of the SMSC's Constitution.

---

[13] The Tribal Court has rejected requests for recusal on the basis of this bias.  There are no provisions for the appointment of other judges, so the Tribal Court states that recusal would eliminate the Tribal forum and therefore "the rules regarding disqualification yield to the Rule of Necessity." SMSC et. al. v. Smith et. al., 001-94, 2 (1995) (Exhibit 26).

The Memorandum's sweeping pronouncements about *res judicata* are unfounded. When the specific matters at issue in the Second Amended Complaint are focused upon, it is clear that none of issues have been litigated and decided in any of the prior litigations cited by the Government.  First, the instant APA challenge to the Department's arbitrary, capricious and inconsistent approval of the <u>Third</u> Adoption Ordinance has never been litigated anywhere between the parties.  This is a new issue that did not arise until that ordinance was voted upon and later "approved" by default by Secretary Babbitt in 1997.

Second, <u>Smith v. Babbitt</u>, 875 F. Supp. 1353 (D. Minn. 1995), did not address whether the Defendants' approval of the Second or the Third Adoption Ordinance violated the APA.  <u>Smith v. Babbit</u>, filed in 1994, sought to require the Secretary to ascertain the eligibility under IGRA, a then new federal law, of each person receiving a <u>per</u> <u>capita</u> distributions and to escrow certain gaming revenues pending resolution of the case.  The district court held that the IGRA did not create any such responsibility for the Department. <u>Id.</u> at 1361.  Ironically, in affirming, the Court of Appeals relied on the IBIA's reversal of the Area Director's disapproval of the Second Adoption Ordinance, nothing that that "ordinance has now been approved."  <u>Smith v. Babbitt</u>, 100 F.3d 556, 559 (8th Cir. 1996).  Of course, that Second Adoption Ordinance was later properly <u>disapproved</u> in the remand decision of the Assistant Secretary.  Thus, the central predicate to Plaintiffs' alleged "loss" in <u>Smith v. Babbit</u>, the supposed legality of the Second Adoption Ordinance, turned out to be wrong. For Judge Robertson,   <u>Smith v. Babbit</u> had no *res judicata* or collateral estoppel impact, and it likewise should have none here.

Third, the prior tribal court decisions do not raise the same issues in the Second Amended Complaint.  Indeed, when the issue of the Second Adopted Ordinance was

remanded by Judge Robertson back to the IBIA, the Department considered whether the

tribal court decisions had decided any of the remand issues.  The BIA attorneys stated

unequivocally that those tribal decisions did not:

> *Shakopee Mdewakanton Sioux (Dakota) Community Business Council*, Case
> No. 311-98 in tribal court, <u>do</u> not raise the same issues as remanded to the
> Department.

Exhibit 25 at 3 (emphasis added).  The Government has not explained why the prior

unambiguous conclusion of the Department's attorneys on this very issue is wrong.

Fourth, the issue of whether the Department complied with the remand decision of

Judge Robertson in <u>Feezor</u> (Count II of the Second Amended Complaint) has never been

litigated in any proceeding.  This is a new issue that arose after the litigations cited in the

Memorandum.

In sum, it is clear that none of the issues which this Court is actually being called

upon to decide have been previously litigated or decided in any preclusive fashion, <u>except</u> the

<u>illegality</u> of the Second Adoption Ordinance.  Thus, to the extent that there may be any

"claims preclusion" here, it is Plaintiffs who are in the position to argue preclusion as to the

illegality of the identical Third Adoption Ordinance.  After all, the <u>Department's</u> attorneys,

including its Solicitor, repeatedly opined that the legality of the Third Adoption Ordinance

rests upon the legality of the Second.

## V.     <u>THE SMSC IS NEITHER A NECESSARY NOR INDISPENSABLE PARTY AS TO COUNT I[14]</u>

The relief sought regarding Count I of the Second Amended Complaint relates to

<u>remanding</u> certain issues regarding the Third Adoption Ordinance back to the Department.

---

[14] The Government limited its Rule 19 argument to Count I.  It is not an issue for Counts II and III.

As was true in <u>Feezor</u>, such relief does not raise Rule 19 issues.  <u>See</u> <u>Feezor</u>, 953 F. 2d at 7, n4.  Judge Robinson correctly addressed the same Rule 19 argument in <u>Feezor</u> and that decision should be followed here.  Moreover, the SMSC has entered as an <u>amicus</u> and all of its "interests" will be heard by this Court.

As in <u>Feezor</u>, complete relief can be accorded in the present action without the official joinder of the SMSC because the relief requested by Plaintiffs is limited to the remand of issues to the Defendants; <u>no</u> actions are required of the SMSC.  The Government's assertion that Plaintiff seeks to have the Tribe change its law is unfounded rhetoric.  Plaintiffs seek to have a federal administrative decision overturned as arbitrary and capricious.  In doing so, Plaintiffs do not seek any change in law; they merely seek that the Department discharge its legal duty to uphold the <u>existing</u> Constitutional provisions of the SMSC.

As in <u>Feezor</u>, complete relief as to Count I can be afforded in this matter by this Court.  The SMSC was not a necessary party in <u>Feezor</u> which involved the Department's arbitrary and capricious approval of the Second Adoption Ordinance.  The issue in Count I involves approval of the essentially identical Third Adoption Ordinances.  There is no basis on which to distinguish these two cases for Rule 19 purposes.

A.    <u>The SMSC Does Not Have A Legally Protected Interest At Stake As To The APA Claims.</u>

The SMSC does not have a legally protected interest in the APA claims of Count I. The Defendants are required to exercise their administrative duties in a manner consistent with the APA.  Plaintiffs ask the Court to remand to Defendants the issues stated in the Second Amended Complaint for a decision consistent with the APA.  The only possible interest the SMSC can assert against such a result would be in a decision inconsistent with the APA.  Such an interest is not a legally protected one, as all tribes "have an equal interest

in an administrative process that is lawful." <u>Makah Indian Tribe v. Verity</u>, 910 F.2d 555, 559

(9th Cir. 1990).  <u>See</u> <u>also</u> <u>Ranson v. Babbitt</u>, 69 F. Supp. 2d 141, 148 (D.D.C. 1989), <u>rev'd</u> <u>on</u>

<u>other</u> <u>grounds</u>, <u>sub</u> <u>non</u>, <u>Smoke et al. v. Norton et al.</u>, 252 F.3d 468 (D.C. Cir. 2001)

(constitutional tribal government not a necessary party in APA challenge to BIA decision);

<u>Ramah Navajo School Board v. Babbitt</u>, 87 F. 3d 1338, 1351 (D.C. Cir. 1996) (Government

able to represent tribal interests).

B.      <u>The SMSC Is Not An Indispensable Party</u>

Assuming *arguendo* that the SMSC is a necessary party as to Count I, SMSC is not

an indispensable party based upon the four factors considered in the analysis.

<u>First</u>, remand of the matter back to the Defendants will not be prejudicial to the

SMSC.  The Third Adoption Ordinance is expressly subject to Defendants' review pursuant

to the Community's Constitution.  A judgment in the present action will merely ensure that

Defendant's review of the Third Adoption Ordinance comports with the APA, something

about which the SMSC cannot complain.  Furthermore, it can be expected that attorneys and

persons claiming to represent the SMSC will be heard by the Department on remand, just as

the Department heard from the SMSC when the issue of the Second Adoption Ordnance was

remanded to the Department by Judge Robertson in <u>Feezor</u>.

<u>Second</u>, Plaintiffs request limited relief.  The SMSC is not required to undertake any

actions or assume any burdens as a result of the relief requested.  Therefore, any prejudice to

the SMSC can be lessened or avoided by the Court's careful shaping of relief consistent with

Fed. R. Civ. P. 19(b), just as Judge Robertson did in <u>Feezor</u>.  Moreover, the SMSC has the

means at its disposal to eliminate the "prejudicial" impact of any actions taken in this matter

by the Court or the Department on remand.  All the SMSC has to do to protect its interests in

the adoption ordinances is to enact a Constitutional amendment which incorporates the new

adoption or membership standards the current SMSC leadership wants to implement.  The

SMSC leadership has complete control of the outcome.  All it has to do is follow the rules

and there will be no issues of interference with tribal sovereignty.

Third, as stated above, complete relief can be granted in the absence of the SMSC.

The relief requested by Plaintiffs requires only remand to Defendants.  A judgment rendered

in the SMSC's absence is therefore adequate to the Plaintiffs.

Fourth, Plaintiffs certainly will not have an adequate remedy if this case is dismissed

for nonjoinder.  Indeed, they will have no forum.  State courts are not proper forums for APA

claims. See Federal National Mortgage Associates v. Le Crone, 868 F. 2d 190, 193 (6th Cir.

1989) (Congress has vested exclusive jurisdiction over APA actions in the federal courts).

Tribal courts have no jurisdiction over the Defendants or over APA claims.  See Nevada v.

Hicks, 533 U.S. 353, 367 (2001) (tribal courts have no jurisdiction over federal claims absent

an explicit statutory grant of authority).  Courts must be "extra cautious in dismissing a case

for nonjoinder" when a plaintiff will not have an adequate remedy following dismissal.

Wichita & Affiliated Tribes v. Hodel, 788 F. 2d 765, 777 (D.C. Cir. 1986); see also Park v.

Didden, 695 F.2d 626, 631 n13 (D.C. Cir. 1982) (characterizing as "misguided" the dismissal

of a claim when the plaintiff lacked an adequate alternative forum).

C.    The Present Action Can Proceed in Equity and Good Conscience Without
      Joinder Of The SMSC

Assuming, *arguendo,* that the SMSC is a necessary party, this case should proceed in

its absence.  When a party's indispensability is examined, "the court shall determine whether

in equity and good conscience the action should proceed among the parties before it ..." Fed.

R. Civ. P. 19(b).  "The major focus is equity and good conscience, which permits the court to

consider all circumstances bearing on the fairness or advisability of choosing one course over

the other." Fed. R. Civ. P. 19(b) Advisory Committee Notes to the 1966 Amendments.  Rule

19(b) analysis "leaves the district judge with substantial discretion in considering which

factors to weigh and how heavily to emphasize certain considerations in deciding whether the

action should go forward in the absence of someone needed for a complete adjudication of

the dispute." Cloverleaf Standardbred Owners Association v. National Bank of Washington,

699 F. 2d 1274, 1277 (D.C. Cir. 1983).

     This case arises from a persistent and wholesale disregard of the Community's

Constitution with illegal voting and with the qualified members vanquished to minority status

in their own tribe.  Irregularities and disputes have created confusion for over ten years about

the legality of tribal adoption practices, voting rights, distribution of Community funds, the

authenticity of membership rolls, and other issues, all too important to remain unsettled.  The

Feezor remand sought to clarify these disputes and get a decision that worked towards

resolution of those issues and a factual determination about voter eligibility.  However,

clarity was intentionally foiled by the SMSC leadership by its passage of the Third Adoption

Ordinance in defiance of the authority of the District Court.

     The SMSC, by its Constitution, expressly asked that the Department entangle itself

with review and approval of changes in membership criteria.  By inclusion of that provision

into its Constitution, the SMSC expected that issues regarding the Department's exercise of

that function would be subject to federal law (such as the APA) and end up in federal court.

Given the lack of any other alternative forum in which Plaintiffs' APA claims may be heard,

equity and fairness demand that harmonization be achieve in this forum, even if the SMSC is

not a named party.  The SMSC is participating as an amicus so its interests/arguments are

being heard by the Court.  It certainly has the resources to fully participate as an intervenor if it believes that the Government cannot adequately represent its interests or if it has more to say beyond what it stated in its <u>amicus</u> brief.  However, should SMSC choose not to participate beyond the <u>amicus</u> status, the case should proceed because the SMSC itself holds the keys to whether its interests will be prejudiced.  It can make everything go away by passing a Constitutional amendment, changing the membership requirements of the Constitution to the liking of the current leadership.   That fact alone separates this case from the other Rule 19 cases cited by the Government.  In no other case could the "absent party" so easily protect its interests.

## VI.     **THE DEPARTMENT'S OTHER JURISDICTIONAL ARGUMENTS ARE WITHOUT MERIT**

A.     <u>Plaintiffs' Claims Fall Within The APA Waiver of Sovereign Immunity</u>

Section 702 of the APA waives the federal government's sovereign immunity from suits brought pursuant to APA.  5 U.S.C. § 702.  The Second Amended Complaint expressly alleges that Defendants have not articulated any valid reason for the inconsistency of their decisions regarding the Second and Third Adoption Ordinances.  Unexplained deviation without explanation from previous similar agency action is arbitrary and capricious.  <u>See</u> <u>Teva Pharmaceuticals, USA, Inc. v. United States FDA</u>.  182 F.3d 1003 (D.C. Cir. 1999) (agency action arbitrary and capricious when the agency "has taken an inconsistent position in another case and failed to explain adequately the inconsistency.").  Plaintiffs' allegation unquestionably fall within the APA.  The fact that this matter involves a "tribal dispute" does not take it out of the APA.  <u>Milam</u>, <u>supra</u>, at 3015.  ("Where plaintiffs question not only the propriety of tribal action, but the legality of acts of federal

officials in approving tribal actions, the matter is not merely an intratribal dispute insulated from federal court review"). Judge Robertson properly rejected this same argument in <u>Feezor</u>. 953 F.Supp. at 4. Moreover, the Second Amended Complaint does not seek to "compel" agency action any more than was involved in <u>Feezor</u>. Plaintiffs seek a traditional judicial review of an agency decision that is arbitrary and capricious in violation of the APA.

B.      <u>Plaintiffs Are Not Asserting a "Free-Standing" APA Claim</u>

        The Government's position ignores the pleadings wherein Plaintiffs expressly allege various law violations in the approval of the Ordinances (Second Amended Complaint, at  paragraphs 5 and 57). The various laws and statutes at issue include 25 U.S.C. § 476(a) by which the Defendants are required to review and approve changes to the Community's Constitution. 25 U.S.C. § 1300d-1 requires the Secretary to review and approve the membership roll of the SMSC for purposes of receiving certain federal land settlement funds. In addition, Defendants were required to approve or disapprove the "Adoption Ordinances" pursuant to their <u>federal</u> duties imposed by the Community's Constitution. The Community's Constitution requires Secretarial approval of tribal ordinances. This provision, in tandem with the Indian Reorganization Act ("IRA") creates a legal burden upon Defendants to approve or disapprove tribal ordinances. <u>Feezor</u>, 953 F.Supp. at 3. Defendants were also required to approve or disapprove of the "Adoption Ordinances" pursuant to their trust responsibilities. For example, <u>Seminole Nation</u> clearly holds that attempts to change the core membership criteria of an Indian tribe implicates the Department's trust responsibilities. <u>Seminole Nation of Oklahoma v. Norton</u>, (Exhibit 21 at 31).

Indeed, in that case the Department's lawyers emphasized the Department's trust

responsibility to protect a tribe's core membership criteria.  (Exhibit 22, at 17-18).

Finally, in 1980.  Congress enacted Public Law 96-557 which, *inter alia*, stated that

the lands the SMSC (including those were the SMSC casino is located) "are hereby

declared to hereafter be held by the United States … in trust for the Shakopee

Mdewakanton Sioux Community of Minnesota."  When Congress passed this law, the

SMSC had already established in its Constitution, with the Government's assistance,

a specific identity of who was a Shakopee Mdewakanton Sioux.  It is apparent that

Congress obligated the Department to exercise trust responsibilities towards the

Shakopee Mdewakanton Sioux Community as it existed in 1980.  Surely, Congress

intended the Department to exercise those trust responsibilities in favor of the

Constitutionally qualified members of the Community which the Department helped

define, not subsequent unqualified "adoptees" who were illegally added years later to

the enrollment lists as the SMSC's gaming wealth grew.

C.      The 90-Day Review Provision In the Constitution Does Not Limit This
         Court's APA Jurisdiction

        The Community's Constitution provides for review of ordinances by the Secretary

within 90 days of submission by the Community.  However, neither the Defendants nor this

Court are bound by the 90-day review provision.  As set forth above, the Third Ordinance is,

in effect, an amendment of the Second Ordinance.  The Second Ordinance was disapproved

by the Defendants within the 90-day Secretarial review period.  That disapproval therefore

remains subject to the Defendants' review and enforcement.  If there is agency jurisdiction

over the Second Adoption Ordinance, *a fortiori* there is agency jurisdiction over the

dependent Third Adoption Ordinance.  Solicitor Leshy's Opinion explains on behalf of the

Department why that provision did not deprive the Department of jurisdiction over the Third

Adoption Ordinance following that 90-day period.  (Exhibit 15 at 26-28).  Once again, the

Government's Memorandum does not explain its flip-flop on this point or explain why the

Department's Solicitor was wrong.

In addition, absent a specific statutory provision limiting the time for judicial review,

"agency action is subject to judicial review … for judicial enforcement."  5 U.S.C. § 703.

The Constitutional provision merely delineates the period in which the Secretary may review

tribal ordinances; it is not a time limit for judicial review of agency decisions, and does not

prevent Defendants from complying with a court order relating to the Second or Third

Adoption Ordinance.  See Block v. Community Nutrition Institute, 467 U.S. 340, 346 (1984)

(distinguishing Secretarial review and judicial review.); Cf. Laminators Safety Glass

Association v. Consumer Product Safety Commission, 578 F.2d 406, 408 (D.C. Cir. 1978)

(finding judicial review of agency action unavailable only when a statutory provision limits

judicial review).  No statutory provision limits judicial review of the agency action presently

in dispute.  Moreover, the Department's ongoing trust responsibility is to protect against

assaults on a tribe's membership criteria is not limited by the 90-day Secretarial review

period, and the Defendants have the authority and responsibility to take actions necessary to

fulfill their trust responsibilities at any time.  See Milam, supra, at 3015.

## VII.    COUNT II IS NOT SUBJECT TO DISMISSAL ON THE PLEADINGS

Although it is clear that the Department did not comply with the remand Order of

Judge Robertson in Feezor and that the Department ignored the advice of its staff attorneys

and its Solicitor on how to comply with Judge Robertson's Order,[15] the Government

---

[15] The Government's Memorandum conveniently sidesteps the contrary position of the BIA staff and Solicitor
Leshy on this point.  Plaintiffs' position parallels the Solicitor's Opinion on what the Department was obliged to

nevertheless argues that it did comply with the remand Order.  But the allegations have to be taken as true at this stage and the Government's factual contention and arguments about compliance (which introduces "facts" outside the pleadings) cannot be addressed and resolved in the context of a motion to dismiss on the pleadings.

The Government now also argues that this Court does not have "subject matter" jurisdiction over Count II because Plaintiffs should have brought their complaints about noncompliance back to Judge Robertson in <u>Feezor</u>.  But the Government  neglected to inform this Court that the Plaintiffs did just that.  (Exhibit 27).  The Government also neglected to inform this Court that when Plaintiff tried to bring the issue of noncompliance before Judge Robinson <u>the</u> <u>Department</u> successfully argued that the Court had no jurisdiction over the matter and that any such complaints would have to be brought <u>in</u> <u>a</u> <u>separate</u> <u>suit</u>.  (Exhibit 28 at 15 and 19).  ("If the Plaintiffs are dissatisfied with, and wish to challenge the Department's Decision, they have the <u>option</u> of filing a <u>new</u> <u>action</u> …") ("There is no authority to support Plaintiffs' request that this Court reopen the case over a challenge to a Department decision issued subsequent to this Court's December 1996 Opinion and Order.").  Plaintiffs have now brought the very separate suit which the Government previously successfully argued they were required to file.

This, unfortunately, illustrates how the Government has persistently flip-flopped and used inconsistent positions to whipsaw the Plaintiffs, individuals of limited means.  It is another example of how the Department has used procedural maneuvers and argument to wear down and frustrate Plaintiffs' legitimate attempts to have their claims promptly reviewed.  It also is another example of Department's willingness to depart from its

---

do in order to comply with the remand Order.  Indeed the Solicitor's Opinion observed that "it would serve no useful purpose for the Department to ignore the remand and fail to develop an adequate record on the matters in dispute with respect to the remand" (Exhibit 15 at 2).

traditional positions when it comes to protection of the illegal activities of the current

leadership of the SMSC.  Having successfully argued the opposite position previously, the

Department should be estopped from arguing that  Plaintiffs cannot assert their

"noncompliance" claims in a separate suit, particularly since the Memorandum cites no case

authority to support the Department's latest and novel version of subject matter jurisdiction.

## VIII.   COUNT III REGARDING THE BLOOD QUANTUM DETERMINATIONS IS NOT MOOT

The Department <u>asserts</u> in its Memorandum (without reference to any supporting

facts) that the final blood quantum determinations have now been made.  However, there is a

factual dispute as to whether a final agency decision has been made and this matter cannot be

resolved on the pleadings.

The so-called "decision" on the blood quantum matter was made by Aureen Martin,

the "Principal Deputy Assistant Secretary -- Indian Affairs" after she was apparently asked to

resign <u>and</u> while she was negotiating for employment with one of the law firms that

represents the SMSC.  Ms. Martin, without explanation or analysis, summarily affirmed the

ALJ's decision on July 14, 2004.  Her summary approval does not reference the reasons why

she, and not the Assistant Secretary for Indian Affairs, was making the decision on behalf of

the Department.  Nor does it address why she suddenly felt it necessary for her to make those

lame-duck decisions just as she was leaving after they had sat for so many years.  The day

after her decision Ms. Martin filed a notice with the Department stating that she was recusing

herself from decisions concerning the clients of Holland & Knight because she was

negotiating for employment with that firm.  (Exhibit 29).  Holland & Knight then hired Ms.

Martin as a partner (Exhibit 30).  Holland & Knight has represented the SMSC for years in

various matters.  Indeed, attorneys for Holland & Knight, on behalf of SMSC, were present at the scheduling hearing on January 22, 2004 in this very matter.

More importantly, Ms. Martin -- even in the absence of a conflict of interest -- had no legal authority to grab the decision-making power on the blood quantum determinations. Because of their importance,  Secretary Babbitt had expressly ordered that these decisions would be made by the Assistant Secretary of Indian Affairs, not a subordinate.  (Exhibit 31 at 2).  Indeed, the prior decisions had all been made by the <u>Assistant</u> <u>Secretary</u>, as Secretary Babbitt's delegation required.  (Exhibit 32).  Moreover, under the applicable regulations, the <u>Deputy</u> Assistant Secretary had no authority to make this decision, nor was Ms. Martin delegated this authority. [16]  As such, there remains no final <u>agency</u> decision on the blood quantum determinations and the Complaint allegations have not been mooted by Ms. Martin's *ultra vires* act, an act which also raises serious conflict of interest issues because of Ms. Martin's concurrent negotiations for employment by the firm that represents the SMSC.

The Government's position about "standing" is also without merit.  Plaintiffs have expressly alleged injury from the delay in making those determinations (Second Amended Complaint, at paragraph 65).  While these decisions languish, Ms. St. Pierre's voting rights are diluted and her relative percentage of the tribal resources are diluted because these ten individuals are treated as members.  Moreover, the issue of standing were already decided by the BIA which granted Plaintiff St. Pierre the right to intervene in the underlying proceeding because of her interest and injury.  It is disingenuous for the Department to grant Ms. St.

---

[16] Under Order No. 3252 the Secretary of Interior delegated certain specific and limited duties to the Principal Deputy Assistant Secretary – Indian Affairs (Exhibit 33).  None of the powers so delegated relate to the blood quantum determinations.  The Principal Deputy is also delegated certain powers by 209 DM 8 (Exhibit 34). None of the powers so delegated relate to the blood quantum determinations.

Pierre Intervenor status because of her direct interests in the blood quantum decisions but then to  argue years later that she has no interest in the decisions.

## <u>CONCLUSION</u>

None of the arguments advanced by the Government support dismissal of Plaintiffs' claims under the APA regarding the Third Adoption Ordinance or dismissal of Plaintiffs' effort to compel the Department to comply with the <u>Feezor</u> remand Order.  This Court is the proper forum for adjudication of whether the Department's decision regarding the Third Adoption Ordinance was consistent with the disapproval of the identical Second Adoption Ordinance and not arbitrary and capricious.  That issue cannot, and should not, be decided in any other forum.

This Court will hear of the SMSC interests either through the Department's attorneys or from the SMSC as an <u>amicus</u>.  Moreover, SMSC has another available forum to fully protect its interests in the adoption practices - - all it has to do is amend the Community's Constitution in the procedural fashion prescribed in its Constitution by its members, the ultimate act of tribal self-determination.  The Department should be encouraging that lawful method of tribal self-determination as the means to resolve whom should be a member of the tribe and whom should share in the Community resources, rather than enabling the persistent and widespread violations of the Community's core Constitutional provisions and federal law by the current SMSC leadership which does not allow the qualified <u>members</u> to make fundamental decisions about the Community's character, governance, and resources.

Respectfully submitted,

Bode and Grenier, LLP


_____*Randell C. Ogg /s/*_____

Randell C. Ogg, DC Bar No. 324772
Bode and Grenier, LLP
1150 Connecticut Ave., N.W., Ste. 900
Washington, D.C. 20036-4192
 (202) 862-4323

and

Elizabeth T. Walker, VA Bar No. 22394
Of Counsel
Walker Associates
127 South Fairfax Street, Suite 126
Alexandria, Virginia  22314
(703) 838-6284 (T)
(703) 838-0184 (F)
Liz@Liz-Walker.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of October, 2004, a true copy of the

foregoing Plaintiffs' Opposition to Motion for Judgment on the Pleadings was served via

electronic case filing on:

Edward J. Passarelli
Senior Counsel
General Litigation Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20004

David B. Johnson
Office of the Solicitor
U.S. Department of the Interior
1849 C. Street, N.W.
Mailstop 6456
Washington, D.C. 20240

_____*Randell C. Ogg /s/*_____
Randell C. Ogg